IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRENDA L. SWENSON          )
                           )
v.                         )     No. 2:05-0121
                           )     Judge Nixon/Bryant
MICHAEL J. ASTRUE, Commissioner of )
Social Security[1]         )


To:  The Honorable John T. Nixon, Senior Judge


**REPORT AND RECOMMENDATION**

        This is a civil action filed pursuant to 42 U.S.C. §

405(g), to obtain judicial review of the final decision of the

Commissioner of Social Security denying plaintiff disability

insurance benefits ("DIB"), as provided under Title II of the

Social Security Act ("the Act"), as amended.  The case is

currently pending on plaintiff's motion for judgment on the

administrative record (Docket Entry No. 16), to which defendant

has responded (Docket Entry No. 20).  For the reasons stated

below, the Magistrate Judge recommends that plaintiff's motion

for judgment on the administrative record be DENIED, and that the

decision of the Commissioner be AFFIRMED.

---

        [1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of
Social Security on February 12, 2007, and is "automatically substituted" as
party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

1

Plaintiff previously filed a DIB application on July 26, 2000, alleging disability from January 6, 2000 (Tr. 82-84). That application was denied initially and upon reconsideration (Tr. 48-51).

Plaintiff's current DIB application was filed on July 10, 2002, alleging disability from November 10, 1999 (Tr. 75-79). The application was denied initially (Tr. 46-47) and upon reconsideration (Tr. 44). Plaintiff thereafter requested and received a hearing before an Administrative Law Judge (ALJ), held on September 16, 2004 (Tr. 525-45). Plaintiff appeared at the hearing with counsel, and testimony was received from plaintiff and an impartial vocational expert (VE). At the conclusion of the hearing, the ALJ closed the record and took the case under advisement.

On October 22, 2004, the ALJ issued a written decision in which he found that plaintiff was not disabled (Tr. 17-26). The decision contains the following enumerated findings:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through March 31, 2002.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant's herniated discs in the neck with stiffness in the left shoulder and left arm, headaches, and depression are considered "severe" based on the

2

requirements in the Regulations 20 CFR § 404.1520©).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity:  to lift and/or carry 20 pounds occasionally and lift and/or carry 10 pounds frequently.  She can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday and can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.  With the right upper extremity she is limited to occasional overhead reaching but is otherwise unlimited.  With the left upper extremity, she is limited to occasional overhead reaching, and otherwise frequent reaching and frequent handling.  She can frequently climb, balance, stoop, kneel, crouch, or crawl.  She is precluded from work around vibration.  The claimant can understand, remember, and execute some detailed instructions on a sustained basis overall with occasional difficulty only.  She can relate appropriately with superficial public contact only, she will have occasional difficulties interacting with coworkers.  Her ability to adapt is within normal limits.

7.  The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8.  The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

9.  The claimant has "a limited education" (20 CFR § 404.1564).

10.  The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

3

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as sales clerk, with 3,600 jobs existing in the regional economy and 183,000 in the national economy; receptionist, with 1,200 jobs existing in the regional economy and 70,000 in the national economy; and inspector/tester/sorter, with 3,700 jobs existing in the regional economy and 140,000 in the national economy. The vocational expert also identified jobs at the sedentary level that the claimant was capable of performing. These are: receptionist, with 1,600 jobs existing in the regional economy and 93,000 in the national economy; hand packager, with 330 jobs existing in the regional economy and 11,000 in the national economy; and production worker, with 1,800 jobs existing in the regional economy and 56,000 in the national economy.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g).

(Tr. 24-25)

On October 3, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 6-8), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

4

## II.  REVIEW OF THE RECORD

### A.  Nonmedical Evidence

Plaintiff was born on July 6, 1957, and was forty-four years old when her coverage for disability insurance benefits expired on March 31, 2002 (Tr. 23-24, 157, 528). Plaintiff stated that she had a tenth grade education, and past relevant work as a janitor, housekeeper, and small parts assembler (Tr. 98, 163, 168, 194, 528-531).  She stated that she stopped working in November 1999 after she fell from a ladder at work which caused a herniated disc in her neck (Tr. 531).  Plaintiff said that she saw several doctors for this condition, but they did not recommend surgery so she had epidural shots in the neck which did not help the pain (Tr. 531-532).  She stated that she did not want to take pain medication because of her history of drug abuse.  Id. Plaintiff further stated that she had depression since age thirteen and was divorced from her fourth husband three months before the administrative hearing (Tr. 532-533).  She explained that since 2001 she had monthly appointments at a mental health center for treatment of suicidal or homicidal thoughts that occurred a few times a month (Tr. 537-539). Plaintiff's current medications include Eskalith (lithium), Trazodone, and Paxil for depression (Tr. 102, 463).

5

B.  _Medical Evidence_

1.  _Evidence Prior to Plaintiff's Date Last Insured_

a.  _Evidence Preceding The Onset Date Of Disability_

On May 27, 1997, plaintiff received emergency treatment at the Life Management Center of Northwest Florida after a five-day episode of depression resulted in suicidal thoughts (Tr. 298-299, 303-304).  Edward D. Gibson, M.D., a psychiatrist, diagnosed depression caused by marijuana abuse and a borderline personality disorder (Tr. 289, 304).  Plaintiff gave a history of treatment for a bipolar disorder with depression since age sixteen which included ten suicide attempts (Tr. 288).  Dr. Gibson prescribed antidepressant medication and scheduled plaintiff for monthly follow-up visits (Tr. 289).

On August 22, 1997, after a series of monthly appointments, Dr. Gibson reported that plaintiff continued to smoke marijuana on a daily basis and was depressed besides having a moderate level of anxiety (Tr. 284).  One month later, Dr. Gibson noted that plaintiff "was doing very well" on her medications, and the results of a mental status examination were normal (Tr. 282).  Plaintiff began having follow up appointments every two to three months (Tr. 269-280).

On February 16, 1998, plaintiff reported that she stopped using marijuana and was no longer depressed (Tr. 278).  She also reported having fewer and milder panic attacks.  _Id._

6

On August 27, 1998, Dr. Gibson discontinued plaintiff's medication and reported that follow up appointments were no longer needed (Tr. 271).

The next medical evidence in the record shows that on May 26, and August 25, 1999, plaintiff was treated at Gulf View Family Medical Center for complaints of multiple joint pain, especially in the lower back, left shoulder, arm, and wrist (Tr. 208-210). She received anti-inflammatory medication for arthritis. Id.

On September 30, 1999, James Deas, a certified physician's assistant, examined plaintiff and diagnosed bicep tendonitis that was treated with an injection of steroid medication and an increase in her antidepressant medication (Tr. 205, 207). Plaintiff gave a history of having a herniated disc in the cervical spine. Id. About one month later, Mr. Deas reported that the complaints of pain had improved, the results of a physical examination were normal, and that the etiology of plaintiff's neck pain was "unknown" (Tr. 204, 206). Mr. Deas suggested MRIs of plaintiff's spine. Id.

b. Evidence After Plaintiff's Alleged Onset of Disability

On November 10, 1999, an MRI of plaintiff's cervical spine revealed degenerative disc disease at the C5-C6 level and a diffuse disc bulge "without significant spinal stenosis" (Tr. 201). Degenerative disc disease caused "mild to moderate"

7

narrowing of the neural foramen.[2]  Id.

On November 30, 1999, Mutaz A. Tabbaa, M.D., examined plaintiff and diagnosed chronic back pain, left carpal tunnel syndrome, and spondylosis[3] of the cervical and lumbar spines (Tr. 239).  Although a neurological examination was normal, except for several areas of muscular tenderness, the results of an electromyogram were consistent with carpal tunnel syndrome in the left wrist (Tr. 239-240).  On December 1, 1999, an MRI of plaintiff's lumbar spine showed "minor early" degenerative disc disease at the L3-L4 level with a "minor loss" of the normal disc space and no disc herniation (Tr. 199).

On December 8, 1999, Douglas L. Stringer, M.D., a board certified neurosurgeon, examined plaintiff and diagnosed bilateral carpal tunnel syndrome, degenerative changes of the cervical spine at C5-C6, and "minor" degenerative changes at L3-L4 without nerve root compression (Tr. 237, 479).  A physical examination discovered some weakness in plaintiff's thumbs and "spotty" sensory deficits in a few fingers, which were consistent with carpal tunnel syndrome.  Id.  Forward bending of the lumbar spine was reduced to seventy percent of normal, but the spinal ranges of motion were otherwise normal.  Id.  Dr. Stringer

---

[2]A passage formed by the inferior and superior notches in adjacent vertebrae; it transmits a spinal nerve and vessels.  Dorland's Illustrated Medical Dictionary (Dorland's) 722-23 (30th ed. 2003).

[3]Degenerative joint disease due to osteoarthritis.  Id. at 1743.

8

advised plaintiff to continue working and scheduled her for cervical epidural steroid injections. Id.

On January 7, 2000, Merle P. Stringer, M.D., a neurosurgeon, reported that plaintiff had neck pain radiating into the arms, left carpal tunnel syndrome, and degenerative disc disease of the cervical and lumbar spine (Tr. 235). The results of a neurological examination showed no changes in plaintiff's condition and she agreed to undergo carpal tunnel surgery on the left wrist. Id. Dr. Merle Stringer opined that plaintiff would be able to return to light duty work one week after the surgery. Id. One month later, Dr. Douglas Stringer performed the operation (Tr. 233).

On February 2, 2000, D. K. Vijapura, M.D., a psychiatrist, diagnosed plaintiff with major depression with alcohol abuse and noted that she seemed to be manipulative and medication seeking (Tr. 268). On February 17, 2000, Bruce R. Schoolcraft, D.O., a psychiatrist, examined plaintiff and diagnosed a borderline personality disorder and an adjustment disorder with mixed emotional features (Tr. 266-267). The results of a mental status examination were normal except for an anxious mood (Tr. 267). Plaintiff reported that she abstained from substance abuse for two years and that she had anxiety due to her financial situation (Tr. 266). She stated that her depression was stable and helped by her antidepressant

9

medication.  Id.  This psychiatrist rated plaintiff's score on the Global Assessment of Functioning (GAF) scale at seventy (Tr. 267).[4]

On February 24, 2000, Kenneth A. Finch, M.S., a licensed mental health counselor, reported that plaintiff had "severe to extreme" depression (Tr. 263-264).  This condition required weekly psychotherapy for two months and then therapy on a monthly basis to enable her return to work.  Id.

On March 7, 2000, while plaintiff received weekly psychotherapy from Mr. Finch, Dr.  Gibson evaluated plaintiff and diagnosed an adjustment disorder and a borderline personality disorder (Tr. 261).  The results of a mental status examination were normal, but plaintiff's mood and affect were depressed.  Id.  Dr. Gibson rated her GAF at seventy.  Id.

On March 16, 23, and 30, 2000, Dr. Douglas Stringer injected steroid medication at the C5-C6 and C6-C7 levels of plaintiff's cervical spine to treat complaints of pain in the arms and neck (Tr. 229-231).  Her symptoms improved after the three procedures (Tr. 229).

On May 12, 2000, Dr. Douglas Stringer performed lumbar

_____

[4]GAF is the "clinician's judgment of the individual's overall level of functioning" on a scale of 0-100.  A 61-70 rating indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.  Diagnostic and Statistical manual of Mental Disorders (DSM-IV-TR) 4th Edition, Revised, at 31-32 (2000). The Commissioner has recognized that "the GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorder listings."  65 Fed. Reg. 50746, 50764-50765 (August 21, 2000).

10

spinal blocks with steroid medication at the L4-L5 and L5-S1 levels to treat complaints of pain in plaintiff's back and legs (Tr. 226-227). A physical examination revealed that plaintiff recovered from the carpal tunnel surgery with only "mild weakness" in the grip strength of three fingers in her left hand (Tr. 227). Dr. Stringer diagnosed myofascitis[5] of the cervical, thoracic, and lumbar spine. Id.

On May 15, 2000, Michael W. Walker, M.D., evaluated plaintiff's complaints of headaches and diagnosed "probable" migraine headaches and cervical muscle tension headaches (Tr. 223-225). A neurological examination was normal, except for reduced ranges of motion in the cervical spine (Tr. 224). Dr. Walker stated that plaintiff "probably" did have migraine headaches that were "infrequent" and occurred "only every few months." Id. Dr. Walker noted that most of her headaches were related to the condition of her cervical spine. Id.

On May 16, 2000, an MRI of plaintiff's thoracic spine produced normal results (Tr. 212).

On May 19 and 26, 2000, Dr. Stringer performed lumbar spinal blocks with steroid medication at the L4-L5 and L5-S1 levels to treat complaints of pain in plaintiff's back and legs (Tr. 221-222).

On May 31, 2000, Dr. Stringer performed two occipital

---

[5]Muscle inflammation. Dorland's at 1213.

11

nerve blocks and four cervical spine trigger point injections for
treatment of headache pain (Tr. 219-220). On July 3, 2000, Dr.
Gibson reported that plaintiff had "mild to moderate" depression
caused by occasional marijuana abuse (Tr. 250). The results of a
mental status examination were normal and Dr. Gibson rated
plaintiff's GAF at fifty.[6]  Id.

On November 1, 2000, plaintiff was evaluated by the
Volunteer Behavioral Health Care System, at Plateau Mental Health
Center (PMHC), so she could continue taking Paxil, her medication
for depression (Tr. 452). She gave a history of depression and a
bipolar disorder with occasional psychiatric treatment since age
twelve, and alcohol abuse that stopped in 1992.  Id.  A bipolar
disorder and polysubstance dependence in partial remission were
diagnosed, and plaintiff's GAF was rated at fifty-five to fifty-
six (Tr. 447-450, 453-454). An assessment (CRG Form) indicated
plaintiff's activities of daily living, and tasks performance and
pace were mildly impaired (Tr. 444). Her interpersonal
functioning and ability to adapt to change were moderately
impaired.  Id.

On November 14, 2000, William R. Schooley, M.D., a

---

[6]A rating of 41-50 indicates serious symptoms (e.g., suicidal ideation,
severe obsessional rituals) or any serious impairment in social, occupational
or school functioning (e.g., no friends, unable to keep a job). A 51-60
rating indicates moderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts with
coworkers). DSM-IV-TR at 32.

12

neurosurgeon, evaluated plaintiff's complaints of neck and arm pain (Tr. 339). Plaintiff reported that the cervical steroid injections made her condition worse. Id. Dr. Schooley noted that the prior MRI studies did not show any nerve root impingement and that the results of a physical examination were normal. Id. Dr. Schooley prescribed cervical traction and referred plaintiff to an orthopedic specialist (Tr. 338-339).

On January 22, 2001, Celia M. Gulbenk, M.D., a State Agency medical consultant, reviewed the medical records and completed an assessment of residual functional capacity (RFC)[7] (Tr. 358-366, 475). This physician concluded that plaintiff had the physical capacity to lift and/or carry twenty pounds occasionally, lift and/or carry ten pounds frequently, stand and/or walk a total of about six hours in an eight-hour day, sit for a total of about six hours in an eight-hour day, and operate hand controls with some restrictions on reaching overhead and performing gross manipulations (Tr. 359-360, 362). Plaintiff was also restricted from concentrated exposure to vibrations (Tr. 363).

On February 7 and May 2, 2001, plaintiff had follow up appointments at the mental health clinic (Tr. 442-443). Her GAF

---

[7]A person's RFC delineates what work-related functions the person can still perform despite his or her impairments. It is determined prior to step four of the sequential evaluation process, when the burden of proof is still on the claimant. 20 C.F.R. § 404.1545(a); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

13

was rated at fifty and fifty-five during these sessions. Id. On September 7, 2001, plaintiff related that she had a physical confrontation with someone and lithium medication was prescribed to control her emotions (Tr. 439). Her GAF was rated at fifty. Id. On October 1, 2001, an x-ray of plaintiff's left shoulder produced normal results (Tr. 515).

On October 12, 2001, she was evaluated by Sukhender Karwan, M.D., who diagnosed a mixed bipolar disorder with polysubstance abuse in partial remission (Tr. 437-438). Dr. Karwan rated her current GAF at fifty-five (Tr. 435, 437). Plaintiff reported that in one week she was scheduled to marry her boyfriend whom she had known for the past year (Tr. 435).

On January 4, 2002, Dr. Karwan reported that medication helped plaintiff's symptoms and that her current GAF was fifty-five (Tr. 432-433). Plaintiff admitted to occasionally using marijuana (Tr. 432).

2. Evidence Subsequent to Plaintiff's Date Last Insured

On May 28, 2002, an assessment of plaintiff's lowest level of mental functioning during the past six months (CRG Form) indicated a "moderate" impairment in her activities of daily living; interpersonal functioning; concentration, task performance or pace; and adaptation to change (Tr. 457-459). Her current GAF was 52. On May 29, 2002, Dr. Karwan reported "good" symptom relief with prescribed medication, but plaintiff had a

14

"moderate" degree of anxiety (Tr. 429). Dr. Karwan rated her current GAF at fifty-five and adjusted the medication level (Tr. 430).

On July 8 and 22, 2002, plaintiff had injections of medication in the cervical and lumbar areas of the spine (Tr. 379-380). Myofascitis was diagnosed. Id. On August 15, 2002, Deborah Abraham, Ph.D., a State Agency consulting clinical psychologist, reviewed the medical evidence and completed a psychiatric review form to assess the severity of plaintiff's mental impairment from March 2002 to the current date (Tr. 384-397, 474). This form indicated that plaintiff had an affective disorder, personality disorder, and substance addiction disorder which mildly restricted her activities of daily living, caused moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and did not result in repeated episodes of deterioration (Tr. 394).

A mental residual functional capacity (RFC) assessment completed by Dr. Abraham indicated that plaintiff was not significantly limited in her ability to:  remember locations and work-like procedures; understand and remember very short, simple instructions; carry out very short and simple instructions; sustain an ordinary routine; work near other people without distractions; make simple work-related decisions; ask simple

15

questions and request assistance; accept instructions from supervisors; maintain socially appropriate behavior and adhere to standards of cleanliness; respond appropriately to changes in a work setting; be aware of normal hazards; set realistic goals or make plans; and travel in unfamiliar places or use public transportation (Tr. 381-382). She had moderate limitations in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities on schedule, maintain attendance, and be punctual within customary tolerances; complete a normal workday without interruptions and perform at a consistent pace; interact with the public; and get along with coworkers or peers without distractions. Id.

Plaintiff's next visit to the mental health clinic was on November 11, 2002, when she reported that she had a thirty pound weight gain because of her medications and was having arguments with her husband (Tr. 423-424). Plaintiff described having homicidal impulses toward her husband (Tr. 423). Plaintiff also reported taking Tylenol for migraine headaches that lasted "all her life" (Tr. 423). Plaintiff's medications were adjusted, but she was considered "noncompliant" with taking her medication. Id.

At her appointment in March 2003, plaintiff stated that she was suicidal and homicidal (Tr. 421). She exhibited high

16

symptoms of anger and mood swings and moderate poor sleep.
Mental status evaluation revealed an intense affect and labile
range of affect (Tr. 421). A crisis assessment was done (Tr.
414-420). Plaintiff's GAF was 45 (Tr. 419). She was to switch
from Lithium to Topamax, and her other medical dosages were
adjusted (Tr. 422). Plaintiff contracted for safety and was sent
home (Tr. 419).

In June 2003, plaintiff returned to PMHC (Tr. 412).
She had left her husband and was essentially homeless; she was
living in a friend's cabin with no electricity or water. Her
affect was subdued and her range of affect was narrow (Tr. 412).
Plaintiff's high GAF over the past year was 50 (Tr. 413).
Risperdal was added to her medications because she hallucinated
on Seroquel. Topamax was increased (Tr. 413). In July 2003,
plaintiff's medications were adjusted again (Tr. 411). She was
having trouble sleeping with Trazodone (Tr. 410). She reported
racing thoughts and homicidal thoughts. She also reported mood
swings. At another appointment in July 2003, plaintiff reported
feeling much better on Topamax (Tr. 408). A trial of Ambien was
prescribed (Tr. 409).

In October 2003, plaintiff reported bouts of impulsive
anger and fleeting suicidal thoughts (Tr. 406). She exhibited a
subdued affect and a narrow range of affect. She appeared tired
and low on energy (Tr. 406). She was continued on Ativan,

Effexor, Synthroid, Ambien, Topamax, and Risperdal (Tr. 407).
Lamictal and Hydroxyzine were added. These medications were
continued in November 2003 (Tr. 405). In December 2003,
plaintiff had been off of her medications for a week and reported
suicidal thoughts and more depression (Tr. 402). She described
symptoms of obsessive-compulsive disorder (OCD) and racing
thoughts. Effexor was discontinued and Luvox was prescribed (for
OCD). (Tr. 403). Risperdal was increased to address anger and
racing thoughts (Tr. 403).

Plaintiff was feeling better in January 2004 after
resuming her medications (Tr. 400). Her affect was subdued. Her
high GAF over the past year was 50 (Tr. 401). In March 2004,
plaintiff reported an increase in racing thoughts, anger, and
depression (Tr. 497). She admitted to suicidal thoughts. On
mental status examination, plaintiff appeared tired with lower
energy than usual (Tr. 497). Luvox was discontinued because she
was bipolar (Tr. 498). Lamictal was increased. Plaintiff's
current GAF was 45 with a high of 50 and a low of 45 over the
past year (Tr. 499). In April 2004, plaintiff was still having
panic attacks (Tr. 494). She reminded the clinician that she had
three personalities. Topamax was increased (Tr. 495). In May
2004, plaintiff reported that someone was threatening to kill her
(Tr. 491). She was having panic attacks, nightmares, and
increased depression. Ativan was temporarily increased (Tr.

18

492).  Plaintiff reported an improvement in her symptoms in June 2004 (Tr. 488).

On a CRG assessment dated June 11, 2004, plaintiff was rated as having marked limitations regarding activities of daily living and interpersonal functioning (Tr. 485-486).  She had panic attacks in crowds and an anger problem.  She was rated as having moderate limitations regarding adaptation to change; she would obsess over bad news (Tr. 486).  Her current GAF was 45 (Tr. 487).

## III.  CONCLUSIONS OF LAW

### A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th

Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401

(1971)).  It has been further quantified as "more than a mere

scintilla of evidence, but less than a preponderance."  Bell v.

Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996).  Even if

the evidence could also support a different conclusion, the

decision of the ALJ must stand if substantial evidence supports

the conclusion reached.  Her, 203 F.3d at 389 (citing Key v.

Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the

record was not considered as a whole, the Commissioner's

conclusion is undermined.  Hurst v. Sec'y of Health & Human

Servs., 753 F.2d 517, 519 (6th Cir. 1985).

B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an

entitlement to benefits by proving his or her "inability to

engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level

of review, the claimant's case is considered under a five-step

sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.

20

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[8] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

(5) Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u> In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima facie</u> case by coming forward with particularized

---

[8]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

21

proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in rejecting the opinions of her treating mental health professionals, and in discounting the credibility of her subjective pain complaints. As discussed below, the undersigned finds that the ALJ's decision is supported by substantial evidence, and is free of the errors alleged by plaintiff.

### 1. Plaintiff's Treating Clinicians at PMHC

Plaintiff argues that for the two-year period beginning February 2001, the records of her treatment at PMHC "show a general pattern of level 50 GAF's with some increases to a level of 55 and some decreases to the level of 45[, demonstrating] ... that her level of functioning has not remained at a level that would allow her to sustain work activity on a regular, continuing

22

basis." (Docket Entry No. 17 at 10)(citing Tr. 401, 413, 419, 424, 436, 439-40, 459, 487, 499) She disputes the ALJ's finding that the observations by PMHC clinicians are inconsistent with a high GAF score of 50, noting that their records reflect plaintiff's report of significant symptoms, as well as her diagnosis with bipolar disorder. However, the ALJ reasonably relied on the lack of evidence establishing a GAF of 50 for twelve continuous months, where the evidence otherwise indicated that progress was made at her counseling sessions and her GAF *during her insured period* was more frequently assessed as 55, a score indicating moderate symptoms. (Tr. 432-33, 435, 437, 442, 447, 448, 450, 454) Notably, only two of plaintiff's ten record citations support the assessment of a GAF of 50 during plaintiff's insured period. It was not until 2003-2004, well past the March 2002 date last insured in this case, that plaintiff's psychological symptoms consistently garnered GAF ratings and other assessments showing "serious" or "marked" limitations of function. Accordingly, the ALJ's treatment of the evidence from plaintiff's psychiatric treatment at PMHC and elsewhere is supported by substantial evidence.

     2.  <u>Plaintiff's Subjective Pain Complaints</u>

     Plaintiff argues that the ALJ erred in discounting the credibility of her subjective complaints of disabling pain, inasmuch as he solely relied upon perceived inconsistencies in

the record, without considering the factors set out in the
regulations at 20 C.F.R. § 404.1529(c)(3). The ALJ's treatment
of the subject is contained in the following paragraph:

> The undersigned notes that there are inconsistencies
> within the record. The claimant testified she injured
> her neck when she fell off a ladder in 1999; however,
> records from Dr. Deas indicate that the neck pain is of
> unknown etiology. At one point she indicated the
> steroid injections helped her and to another physician,
> she reported that they worsened her pain. While the
> claimant may have some limitations the evidence of
> record does not show that they are of such severity and
> duration as to preclude all work activity. Therefore,
> having considered the criteria of 20 CFR 404.1529 and
> Social Security Ruling 96-7p, I deem the claimant's
> subjective complaints not fully credible.

(Tr. 22)

Thus, contrary to plaintiff's argument, the ALJ in this
case discounted plaintiff's subjective complaints in part because
he doubted the candor of her representations as to the origin of
her pain and the success of her physicians' treatment of it, and
in part because "the record does not show" that her symptoms are
of disabling intensity and persistence. It is well established
that an ALJ may properly consider the credibility of a claimant
when making his disability determination, and that this
credibility finding is due great weight and deference in light of
the ALJ's opportunity to observe the claimant's demeanor while
testifying. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th
Cir. 2003). There is likewise no question that a claimant's
subjective complaints can support a finding of disability--

irrespective of the credibility of that claimant's statements--if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record. 20 C.F.R. § 404.1529©)[9]; e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); Social Security Ruling 96-7p, 1996 WL 362209, 61 Fed. Reg. 34483, at *34484-34485 (describing the scope of the analysis as including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists or other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record"; "[A] finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled.").

---

[9]Section 404.1529(c) provides that, "[w]hen the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain," the entire record of medical and nonmedical evidence will be considered in evaluating the intensity and persistence of those symptoms, including the following factors:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use of have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Case 2:05-cv-00121  Document 22  Filed 06/20/07  Page 25 of 32 PageID #: 91

In considering the ALJ's finding on the weight of
plaintiff's subjective complaints, this Court is "limited to
evaluating whether or not the ALJ's explanations for partially
discrediting [plaintiff] are reasonable and supported by
substantial evidence in the record." Jones, 336 F.3d at 476.
Plaintiff contends that the inconsistencies identified by the ALJ
are reconcilable (Docket Entry No. 17 at 11-12), and the
undersigned is inclined to agree.  The etiology of plaintiff's
neck pain was questioned in only one treatment note dated October
21, 1999, in response to frustration over plaintiff's inability
to obtain an MRI of her neck (Tr. 206).  The ALJ accepted
plaintiff's remote history of "herniated discs in the neck" (Tr.
19, 24, 339) despite the fact that such an injury was only
documented in her physicians' recordings of her medical history.
Likewise, plaintiff's April 1999 fall from a ladder while working
is documented by various sources in the record.  While there is
no evidence that plaintiff's work related injury in 1999 involved
disc herniation at any level of her spine (Tr. 199, 201, 212)
(contrary to plaintiff's testimony (Tr. 531-32)), neither is
there any evidence which would cast reasonable doubt upon that
fall being the cause of the neck and back pain at issue here.
Moreover, plaintiff's April 2000 report of good relief from
cervical injections administered in March 2000 (Tr. 227, 229-31)
could for a number of legitimate reasons differ from the report

26

she gave to Dr. Schooley several months later in November 2000, when she reported that the previous injections "made her worse" (Tr. 339). As posited in plaintiff's brief (Docket Entry No. 17 at 12), her comment to Dr. Schooley may have been based on the realization of worsening symptoms over time; it may in fact have been in reference to intervening cervical injections in May 2002 (Tr. 220-22); or, perhaps most likely, it may have been in reference not to worsening neck pain, but worsening headaches which she had earlier attributed to the first round of cervical injections (Tr. 223). Accordingly, even giving the ALJ's credibility findings the deference they are due, the undersigned cannot find the inconsistencies identified by the ALJ as either reasonable or substantially supported grounds for discrediting plaintiff.

Nonetheless, it appears that the ALJ's treatment of plaintiff's subjective pain complaints is otherwise supported by substantial evidence. The ALJ twice cited his consideration of the criteria listed in 20 C.F.R. § 404.1529 and S.S.R. 96-7p (Tr. 19, 22), and also noted his consideration of those medical opinions which reflect judgments about the severity of plaintiff's impairments and resulting symptoms (Tr. 19). While the ALJ did not specifically discuss each of the factors in § 404.1529(c)(3), it does not appear that plaintiff's case for disability is significantly bolstered by those factors, much less

27

the medical record of her impairments and symptoms prior to March 31, 2002.

To begin with, the objective medical evidence, while establishing the existence of spinal abnormalities which are no doubt painful, does not establish any condition which could reasonably be expected to produce disabling pain.  See, e.g., McCormick v. Sec'y of Health & Human Servs., 861 F.2d 998, 1002-03 (6th Cir. 1988).  The MRI studies done in November and December 1999 revealed only minor degenerative changes in plaintiff's cervical and lumbar spine (Tr. 199, 201), as confirmed by her physicians who found no evidence of nerve root impingement or spinal stenosis (Tr. 234, 339).  Cf. Butler v. Sullivan, 1990 WL 112025, at *4 (6th Cir. Aug. 6, 1990)(finding no medical evidence expected to produce disabling pain where claimant suffered from degenerative disc disease with a disc bulge not compressing the nerve roots, and not accompanied by motor strength, sensory, or reflex loss).  While plaintiff alleges the onset of disability as of November 10, 1999, the date of the cervical spine MRI revealing her degenerative disc disease, it is clear that she continued working as a janitor doing some heavy work until January 6, 2000 (Tr. 97, 115, 117, 236, 237, 453), when she stopped working because of impending carpal tunnel surgery "and my employer didn't have light duty." (Tr. 97)  Additionally, plaintiff's neurological examinations

28

have yielded normal results (Tr. 223-24, 235, 239, 338-39), and no treating physician has opined that she is disabled by her impairments or symptoms. Indeed, after a full physical and neurological examination, plaintiff's carpal tunnel surgeon opined on January 7, 2000, that "she will be able to return to work at light duty one week after the carpal tunnel surgery." (Tr. 235)

However, the record contains later references to plaintiff's reports of severe, intractable pain (Tr. 229-31, 238), and her physicians did prescribe cervical epidural injections and other, narcotic pain medications during the relevant time period. Plaintiff also reported using hot baths, a heating pad, and massage with a knotted towel to combat her pain (Tr. 114-15, 151). While plaintiff testified at her hearing that she no longer took pain medication because of past problems with drugs (Tr. 531-32), she clearly took painkillers during her insured period (Tr. 114, 150, 228). Significantly, plaintiff informed the agency that these medicines were effective in relieving her pain without significant side effects (Tr. 114, 150). Additionally, at least the first round of cervical epidural injections appears to have been of significant benefit (Tr. 227). Finally, plaintiff's own testimony does little to illuminate the discussion of disabling neck pain during her insured period, as demonstrated by the following colloquy:

Q    Ms. Swenson, could you describe your neck
     pain and how that affects you?

A    It's like a stiffness in my neck, and when I
     turn my neck it goes down my shoulder, down
     my arm.

Q    And you're pointing to your left arm.  Is it
     only going down your left side?

A    -- left side.  Yeah.

Q    How far can you turn your neck towards your
     shoulder before you start having problems
     with pain going down your left arm?

A    I can't turn it all the way to my shoulder.

Q    Can you turn in halfway there?

A    Yeah.

Q    Do you have any difficulty either looking up
     or looking down?

A    Not really difficulty but stiffness.

Q    Do you have any problems if you use your arms
     in front of your body?

A    No.

(Tr. 535-36)  The ALJ adopted this characterization of

plaintiff's symptoms when he found her severe impairments to

include "herniated discs in the neck with stiffness in the left

shoulder and left arm" (Tr. 24).  Plaintiff further failed to

identify at the hearing any particular trouble with pain while

standing, or while lifting items such as bags of clothes, and

testified that she could sit for about a half hour before needing

to "get up and stretch, move around a little bit."  (Tr. 537)  In

30

view of this testimony and the relevant medical evidence, including the unopposed assessments of the nonexamining state agency consultants that plaintiff could perform a range of light work (Tr. 329-36, 358-66), plaintiff's complaints of disabling pain appear to have been properly discounted.  See Butler, supra.

In short, while the ALJ could have addressed the subject of plaintiff's pain with more particularity, his citation of the relevant standards and his finding that the limited record of plaintiff's treatment during her insured period did not support a finding of disabling pain is sufficient--on this record--to withstand the scrutiny of this Court.  While plaintiff's mental impairments appear to have significantly worsened in the years since her insured period ended, the Commissioner's decision as to her condition prior to March 2002 is supported by substantial evidence.  Accordingly, it is the conclusion of the undersigned that the Commissioner's decision should be affirmed.


IV.   RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report

31

and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 20th day of June, 2007.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

Case 2:05-cv-00121   Document 22   Filed 06/20/07   Page 32 of 32 PageID #: 98